IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| CUMBERLAND HEIGHTS FOUNDATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> MAGELLAN BEHAVIORAL HEALTH, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 03:10-00712 <br><br> Judge Nixon/Magistrate Judge Griffin |

## AFFIDAVIT OF GARY M. HENSCHEN, M.D.

The Affiant, Gary M. Henschen, M.D., being first duly sworn, deposes and states as follows:

1. I am over the age of eighteen (18) years and am competent to make this Affidavit. The matters set forth in this Affidavit are based upon my training, education, knowledge and experience, my personal knowledge of facts, and my review of the business and clinical records of Magellan Health Services, Inc. and Magellan Behavioral Health, Inc. ("Magellan").

2. I am a physician licensed in Tennessee, North Carolina, Georgia Pennsylvania, New Jersey, and Iowa, and the Chief Medical Officer-Behavioral Health at Magellan Health Services, Inc. I am certified in Psychiatry by the American Board of Psychiatry and Neurology. I graduated from the University of North Carolina School of Medicine at Chapel Hill in 1975, and completed my residency in psychiatry at Duke University Medical Center, Durham, North Carolina in 1982, after training in internal medicine and serving as a flight surgeon in the U.S. Army. Attached to this Declaration as **Exhibit 1** is my curriculum vitae.

3. I am submitting this Affidavit in response to the complaint and motion for injunctive relief filed by Cumberland Heights Foundation, Inc. ("Cumberland Heights"). I offer my testimony in this matter for two reasons: (a) I am familiar with Magellan's clinical guidelines and standards expected of facilities such as Cumberland Heights; and (b) I participated in the June 30 site visit at Cumberland Heights, one of the events discussed in this litigation.

4. The treatment of patients with substance abuse is not limited to only the substance abuse recovery process. Patients with substance abuse issues frequently have a combination of medical, psychological and environmental problems. For example, addictive disease is often accompanied by underlying psychological problems such as depression, bipolar disorder, or personality disorders. The presence of two or more diagnoses comprising both mental and physical health is referred to as a "dual diagnosis" or co-morbidities.

5. Addiction treatment commonly begins with detoxification, or "detox," which is the process of ridding the body of certain toxins while helping manage the withdrawal symptoms, often with medication.

6. Patients who are treated for drug or alcohol abuse must be assessed, evaluated and treated for other physical health and psychological problems. Patients who present with abuse issues are considered to be medically "fragile" and may have a variety of other health issues for which Magellan requires the highest quality of clinical care. Studies show that when people use drugs/alcohol for a long period of time, their brains experience changes that exist long after use is discontinued. Accordingly, strong clinical programs that provide medically supervised care help cleanse the body of drug/alcohol-related toxins while helping the patient through uncomfortable and often painful withdrawal symptoms. Concurrently, behavioral therapy helps the patient examine the origins of addiction while teaching them and their support group the skills needed to maintain sobriety.

7. Magellan's philosophy is to promote the delivery of quality, behavioral health care to our members. In support of this philosophy, we adopt, develop, and distribute clinical guidelines and Medical Necessity Criteria. In order for a provider to qualify as an "in-network" provider, we require by contract that Magellan providers comply with Magellan's policies and procedures, and guidelines.

8. My review of Magellan's clinical guidelines governing the quality of care required of its in-network providers is based on my clinical experience, which includes:

(a) I was in private practice for fifteen years during which time I was a provider of substance abuse treatment services;

(b) I have served as the medical director of a hospital, and I am trained and experienced with quality of care programs and monitoring;

(c) Prior to my appointment as Chief Medical Officer for Magellan, I was Magellan's medical director for the Southeastern Region and chaired the Regional Network Credentialing Committee ("RNCC") that has oversight of quality of care issues;

(d) I have been involved in the development of the clinical care guidelines and policies and procedures required of Magellan's providers nationwide.

9. Magellan's clinical guidelines are based upon the American Psychiatric Association's *Clinical Practice Guideline on the Treatment of Patients with Substance Use Disorders, Second Edition*, and also upon other sources of information and guidance in the development of these guidelines. Magellan revises, modifies, amplifies and supplements these guidelines in order to define Magellan's quality of care standards.

10. Magellan reviews its guidelines every other year, and solicits input from within the company, patients, providers, health care plans and other professionals from all over the country.

11. Based upon the totality of this input, Magellan promulgates its clinical guidelines and policies and procedures that define the standards of care required of "in-network" providers of Magellan.

12. In considering the Magellan clinical standards that apply to facilities like Cumberland Heights, it is useful to consider the eight levels of care available for psychiatric and behavioral care:

(a) The most intensive level of care is hospitalization of patients requiring 24-hour medical and nursing care and monitoring. The next most intensive level of care is termed "subacute hospitalization" and is for patients who present some risk of harm to themselves or others, but not the imminent risk of harm that would necessitate 24-hour medical and nursing care.

(b) Residential treatment, such as that offered by Cumberland Heights, is the next most intense level of care and is defined as 24-hour level of care for persons with long term or severe mental disorders that are medically monitored.

(c) Stepping down in intensity are "Supervised Living," "Partial Hospitalization," "Intensive Outpatient Programs" and "Outpatient Treatment."

13. In evaluating the clinical standards of care required by Magellan, it is Magellan's philosophy to provide treatment at the most appropriate, least restrictive level of care necessary to provide safe and effective treatment and meet the patient's biopsychosocial needs. In layman's terms, one of our goals is to help our members return to normal, healthy lives. In order to achieve this goal, Magellan requires its "in-network" providers to provide Magellan members with all of the medical, psychological, behavioral, and counseling services they need, in addition to treatment for substance abuse in accordance with Magellan's clinical guidelines and Policies and Procedures.

14. It is my understanding that Cumberland Heights attributes the termination of its provider agreement and removal from Magellan's network to be the result of a decision by BlueCross BlueShield of Tennessee ("BCBST") to overturn Magellan's decision not to authorize additional benefits in a specific case following an appeal of that benefits decision, referred to as a Level II grievance hearing by BCBST, sometime in October 2009. I deny that the October 2009 was the reason for the termination of the Cumberland Heights' provider contract.

15. I am personally familiar with the appeal of benefits process for Magellan members and Level II grievance hearings by BCBST. These appeal hearings are routine and regularly occur as part of the review process regarding treatment authorization decisions for Magellan members. It is inconceivable that Magellan representatives would become upset over such a decision.

16. I personally participated in the Cumberland Heights' site review conducted by Magellan on June 30, 2010 Upon presenting the site visit team's report to Dr. Brian Kennedy, Medical Director for Magellan's Southeast Care Management Center ("Southeast CMC"), Dr. Kennedy convened a called meeting of the RNCC for the Southeast CMC.

17. After receiving the report of the site visit team, the RNCC concluded that Cumberland Heights' provider contract should be terminated effective immediately due to Cumberland Heights' failure to meet Magellan's standards for quality clinical operations and concerns for patient safety.

18. The deicision to terminate Cumberland Heights' provider contract was based on multiple factors, including (i) the results and findings of the treatment record review during the June 30 site visit that revealed serious quality of care and patient safety issues in almost every record reviewed, (ii) violations of Magellan's policies and procedures, including

its adopted practice guideline on the Treatment of Patients with Substance Use Disorders, Second Edition, of the American Psychiatric Association, and (iii) the fact that Cumberland Heights was already under a Corrective Action Plan ("CAP") issued in March 2010 for quality of care concerns and deficiencies identified during a prior site visit that conducted by Magellan in January 2010, which Cumberland Heights had failed to correct.

19. Magellan required Cumberland Heights, as an in-network provider of residential care for Magellan members with substance abuse issues, to provide quality care for the full range of substance abuse, psychiatric, medical and behavioral issues.

20. During the June 30 site visit, the site review team identified serious quality of care and patient safety concerns in almost every one of the randomly selected treatment records for Magellan members for the period March 2010 through June 2010. This was a small sampling of treatment records for the total number of Magellan members who received treatment services from Cumberland Heights during calendar year 2010. To accurately represent the scope of the problems identified regarding quality of care and patient safety and Cumberland Heights' non-compliance with Magellan policies and procedures, the small sample of treatment records reviewed must be extrapolated to the entire total number of Magellan members treated at Cumberland Heights.

21. I have reviewed Magellan's August 6, 2010 letter summarizing the findings of the June 30, 2010 site visit, which accurately reflects those results. A copy of the August 6, 2010 letter is attached as **Exhibit 2.**

22. I have also reviewed Cumberland Heights' August 9, 2010 letter responding to Magellan's site visit findings. A copy of the August 9, 2010 letter is attached as **Exhibit 3.**

23. The specific patient concerns identified by Magellan and responded to by Cumberland Heights are addressed below on a case by case basis.

24. **Patient #1: "go home and call your dealer."** According to Cumberland Heights' treatment records, this patient left the facility against medical advice before completing the program after the doctor told her to "go home and call your dealer."

    (a) This patient with "co-morbidities" was admitted with complaints of pain and anxiety, along with a dependence on opiods. She required both quality clinical care for her physical health, as well as quality psychiatric counseling and treatment for her substance abuse issues;

    (b) The patient left against medical advice before completing her treatment plan and notwithstanding her condition at admission;

    (c) As the patient left the facility, she told a staff member that her doctor had told her to "go home and call your dealer;"

    (d) In my medical opinion, based upon the treatment records provided for this patient by Cumberland Heights, it failed to provide quality care for this Magellan member under Magellan's standards for network providers for the following reasons:

        (i) The facility failed to manage the patient's anxiety and pain;

        (ii) The facility failed to manage her emotional state, as is evident in the fact that she left the program;

        (iii) The facility created a medical record recording the patient's statement that her doctor had told her to leave and call her dealer, which at a minimum, reflects the emotional state of the patient, and at a maximum, if the statement is true, reflects the callous attitude of her treating physician toward a patient that was medically and psychologically fragile upon admission; and

        (iv) There is nothing in the facility's treatment records provided to the site review team to suggest that there had been any follow up with this patient. A patient who clearly needed medical and psychological care was allowed to leave

the facility against medical advice, without any apparent reaction or review and investigation of the circumstances by the facility.

25. **Patient #2: No psychiatric evaluation:** According to Cumberland Heights' treatment record, this member was admitted for treatment without Cumberland Heights' conducting a psychiatric evaluation.

(a) The member previously had been a resident of Cumberland Heights less than one year earlier and had been released to the care of her psychiatrist.

(b) The member was recently re-admitted to Cumberland Heights.

(c) The treatment record provided by Cumberland Heights reflected that the member did not receive a psychiatric evaluation upon admission.

(d) The treatment record revealed the following problems with the clinical care of this patient:

(i) A member admitted to a substance abuse treatment facility with a psychiatric diagnosis should be given a psychiatric exam upon admission, which would include a complete mental status examination. That is a basic quality of care issue and something that is expected of any provider under standard medical practice.

(ii) Whether the member had undergone a prior psychiatric exam or had a treating psychiatrist outside of Cumberland Heights does not excuse Cumberland Heights' failure to conduct a psychiatric exam upon admission. A complete psychiatric examination is imperative in patients with a history of psychiatric diagnosis and treatment.

(iii) The fact that the patient returned to Cumberland Heights within months after being discharged suggests that prior treatment was ineffective and required Cumberland Heights to re-evaluate the member's case.

(iv) Based upon the records provided by Cumberland Heights, Cumberland Heights violated the policies and procedures of Magellan that require a psychiatric examination upon admission and failed to provide this member with the quality of care required of Magellan in-network providers.

26.     **Patient #8. Continuing problems without re-evaluation:** Based on the treatment records provided, this member was admitted to Cumberland Heights without a biopsychosocial evaluation. The member previously was a resident at Cumberland Heights and was discharged. Two weeks later, the member relapsed and returned to Cumberland Heights, and was admitted for residential detoxification. The relapse indicates that the member's prior therapy was ineffective, despite having been treated with the most intensive level of care provided by Cumberland Heights. Yet, Cumberland Heights did not re-assess the patient with a psychiatric evaluation upon re-admission.

(a) Cumberland Heights excuses its failure to re-assess and to conduct a psychiatric evaluation on the basis that the re-admission was a continuing course of care.

(b) The failure to re-assess the member upon re-admission violates Magellan's policies and procedures, and falls below the quality of care standards required by Magellan of "in-network" providers. This patient was re-admitted for detoxification after treatment by Cumberland Heights; the facility's prior treatment did not work and the provider should have devoted more, not fewer, resources to a Magellan member who failed to respond to the care previously provided.

27.     **Patient #3: Drug Reaction.** Based on the treatment records provided for this member, the records variously indicated "no known drug allergies" or an allergy to penicillin.

(a) Patients with substance abuse issues are medically fragile patients.

(b) Patients receiving treatment at Cumberland Heights are often treated with pharmaceuticals.

(c) Drug reactions are a serious medical concern. Magellan requires its provider facilities to protect its members against adverse drug reactions. Magellan requires its provider facilities to report and to record accurately in the member's treatment record any history of medication allergies for the patient's safety.

(d) There was nothing in the treatment record to indicate that Cumberland Heights had identified this conflicting information or acted to resolve that conflict.

(e) Based upon the treatment records provided by Cumberland Heights, it violated the policies and procedures of Magellan and failed to provide the quality of care required of in-network providers by Magellan.

28. **Patient #4: Co-morbidities and drug interactions.** According to Cumberland Height's records, this member had a complicated medical history. In addition to depression and an addiction to opioids, the member had Addison's Disease, a relatively rare endocrine disorder. While at Cumberland Heights, this member had a syncopal episode during which the patient fainted and had to be transported to and admitted to a local hospital. The member was evaluated for a small bowel obstruction, but it was determined that the member had been dehydrated.

(a) Any time a patient faints, there is a risk of physical injury. When a medically fragile patient faints, the facility should be alerted to carefully examine the patient for potential medical issues and possible drug interactions. The facility also should be alerted to examine its policies and procedures for treatment of patients and for protecting those patients against possible drug interactions.

(b) An evaluation of this member's fainting episode and hospitalization should examine the interrelatedness of his medical conditions.

(i) The member was addicted to opioids or pain killers. Some of the side effects of opioids include fatigue and light-headedness.

(ii) This member suffered from Addison's Disease, which also can cause fatigue and light headedness.

(iii) Patients with Addison's Disease may experience an "Addison's Crisis," which is a potentially fatal medical emergency that may include, among other symptoms, dehydration, low blood pressure and syncope, or loss of consciousness.

(c) An evaluation of this member also should examine the member's various medications and their side effects and interactions.

(i) The member was addicted to opioids, or painkillers. Some of the other side effects of opioids are sedation, depression and constipation.

(ii) The member was being treated for depression with nortryptiline. The side effects of nortryptiline include sedation, constipation and orthostatic hypotension, which is a sudden drop in blood pressure when sitting or standing, which can result in syncope, falls and fractures.

(iii) This member also was being treated with Coumadin. The patient was at risk for a subdural hematoma (bleeding around the brain) and other internal bleeding if the member fell and received an injury. The member was placed at great risk with the use of nortryptiline, known to cause orthostatic hypotension and subsequent falls. With this member, such a fall could have proved fatal.

(iv) This variety of medications could interact, leaving the member especially vulnerable to those interactions because of the member's complicated medical history.

(d) In defending its treatment of this patient, Cumberland Heights illustrates how its standards of care fail to conform to those required by Magellan.

(e) In my opinion and based upon my evaluation and interaction of similar facilities nationwide, the case illustrates the following problems with the quality of care provided by Cumberland Heights:

(i) Whether Cumberland Heights can deal with substance abuse patients with co-morbidities;

(ii) Whether Cumberland Heights is equipped to evaluate and to treat patients who have substance abuse issues that are complicated by serious medical conditions such as Addison's Disease;

(iii) Whether Cumberland Heights is equipped to deal with the potential interactions of the drugs required to be taken by patients with serious medical conditions;

(iv) Whether Cumberland Heights has a basic understanding of psychopharmacology and prominent side effects of psychotropic medications;

(v) Why this case and incident was not analyzed against existing protocols and clinical standards; and

(vi) Perhaps most importantly, why this event, which required the hospitalization of a patient, did not prompt a peer review process that analyzed both existing protocols and clinical standards.

29. **Patient #5: Appropriate levels of care.** Cumberland Heights provided Magellan information on which it relied to approve three days of detoxification for this member; yet, a review of the patient's medical record did not support the need for this level of care.

(a) As noted elsewhere, Cumberland Heights seeks authorization for treatment by providing information to Magellan on which Magellan necessarily relies to assist in determining the appropriate level of care.

(b) As discussed above, Magellan's goal is to assist its members to return to healthy, normal lives as soon as possible. It is detrimental to this goal to treat patients with a more restrictive level of care than necessary. Patients must not hide from, but must confront and deal with, the issues in their lives. This is not an issue of reimbursement; Magellan's compensation for the services it provides is not dependent on how much of the insurance companies' money it authorizes, or refuses to authorize to be spent.

(c) In reliance upon information phoned in by Cumberland Heights, the member was admitted to a residential detox program.

(d) A review of the patient's medical record on June 30 revealed that the member never demonstrated withdrawal symptoms.

(e) Based upon the records provided by Cumberland Heights, Cumberland Heights violated the most basic policies and procedures of Magellan, which is to properly assess the level of care required to treat patients' illnesses in a manner designed to restore them to healthy, normal life as soon as possible.

30. **Patient #6: Coordination of care of medical specialists.** This member presented with an addiction to pain killers and with a number of co-morbidities that interrelated with the member's substance abuse issues; yet, there was no indication that Cumberland Heights did anything other than treat the abuse issues without regard to the necessity of coordinating the care of the member's interrelated medical issues.

(a) The member had a number of medical issues that were not treated while at Cumberland Heights, including:

(i) Hypothyroidism, in which the diagnosis of hypothyroidism was included in the member's written history, but no attempt to assess the status of this disease was made by obtaining thyroid function tests. Furthermore, no attempt was made to treat the patient's reported hypothyroidism, a disease well-known to contribute to depression, a diagnosis attributed to this patient;

(ii) Lumbar disc disease with significant pain contributory to addiction to pain medications; however, there was no documented complete neurological evaluation or exam, no documented attempt to secure neurological consultation, and no documented treatment plan to address pain in connection with addiction issues;

(iii) The physical exam was performed by a nurse practitioner rather than a doctor;

(iv) This member had undergone a psychiatric hospitalization one year before admission to Cumberland Heights for depression related to marital problems; however, there was no documentation of family sessions being conducted during the member's stay at Cumberland Heights; and

(v) This member also signed out of the facility against medical advice after a three week stay.

(b) Based upon the records provided by Cumberland Heights, Cumberland Heights violated Magellan's policies and procedures and standards for quality of care, which is to address and treat all of the interrelated medical conditions that impact the health of patients with co-morbidities, especially when they contribute to the pain syndrome that precipitated the addiction in the first place. It is simply insufficient to suggest that a facility can treat substance abuse issues without also addressing the underlying medical and behavioral issues that lead to the abuse of painkillers.

31. **Patient #7. Failure to provide care recommended by Cumberland Heights.** Cumberland Heights' personnel determined that this member needed a psychiatric evaluation upon admission. The evaluation was never performed.

(a) Patients with substance abuse problems often have both medical and psychiatric issues. It is not enough to wean them off the substance to which they are addicted without addressing underlying causes for addiction.

(b) In this case, the Cumberland Heights counselor who admitted the Magellan member identified the need for a psychiatric evaluation.

(c) Based upon the records provided by Cumberland Heights, Cumberland Heights failed to perform an evaluation that it identified as important to the quality of care being provided to this patient. This is not a case of a failure to treat a co-morbidity for which Cumberland Heights may have needed to refer the patient to a specialist, or a case where a specific event should have but did not generate an examination of the facility's protocols and clinical guidelines. This is an instance where the facility failed to perform a task that it identified for itself, the most fundamental task asked of any treatment facility, a psychiatric examination.

32. The findings described above are based on what was found in Cumberland Heights' own treatment records.

33. Under its provider contract, Cumberland Heights contractually agreed to comply with all of Magellan's Policies and Procedures. While Cumberland Heights may argue that its actions did not fall below a standard of medical care, the fact is that its clinical care fell below the standards of care required by Magellan under its Policies and Procedures, and did not meet Magellan's requirements for "in-network" providers.

34. The purpose of the site visit at Cumberland Heights on June 30 was to conduct a follow-up treatment record review, compile our findings, and report those findings to

the RNCC at its next meeting. Before the site visit, I had not considered terminating Cumberland Heights' provider agreement with cause.

35. Upon completing the June 30 site review at Cumberland Heights, the findings prompted a conversation among the site review team about whether the quality of care concerns required immediate reporting within Magellan. The site review team does NOT make any decisions, but is required to report and to review its findings with the RNCC. The team agreed that our findings were sufficiently serious to merit prompt review by the RNCC.

36. The findings by the Magellan site visit team cannot be dismissed on the basis of Cumberland Heights' failure to provide the team with information that could have been found in Cumberland Heights' "electronic medical records." Without regard to what might otherwise be available at the facility, other clinicians providing patient care must be able to rely upon the treatment records created and produced by Cumberland Heights.

(a) Magellan relies upon treatment records transmitted by Cumberland Heights in making decisions to authorize treatment and benefits, just as it relied on Cumberland Heights to produce complete treatment records for review on June 30.

(b) Other clinicians providing care to Magellan members likewise must be able to rely upon Cumberland Heights' treatment records. Members who seek treatment for substance abuse are medically fragile, many present with co-morbidities, and it is entirely predictable they will require hospitalization or treatment by other medical professionals.

(c) Problems with treatment recordkeeping are problems with the quality of clinical care. In many cases, Cumberland Heights is only one of many health care providers for Magellan members. All of the providers who treat Magellan members should be able to rely upon the accuracy and completeness of the treatment records provided by Magellan "in-network" providers.

(d) The suggestion that Cumberland Heights holds additional information in its electronic medical record that it failed to deliver to Magellan during a site visit is an admission that none of Magellan's members' other medical providers can be assured that they will be provided a complete and accurate treatment record.

37. The Magellan site review team found serious problems with **all** of the Cumberland Heights treatment records reviewed on June 30, 2010.

(a) Had we found problems with even a single file, Magellan would have required Cumberland Heights to elevate its care to the quality standards required by Magellan's policies and procedures. Problems appearing in even one of eight treatment records would require some action because of the implications of that error rate to the high volume of Magellan members who receive treatment at this facility.

(b) Our actual review found problems with every treatment record, some more serious than others. The discovery of problems in such a high percentage of the charts sampled in a follow up site visit for a facility on a CAP was both very surprising and a source of significant concern to me. We found different types of problems in the eight treatment records reviewed, all of which implicated Magellan's policies and procedures and indicated a failure to comply with Magellan's standards for the quality of member care for "in-network" facilities.

(c) In my professional opinion, based upon my education, knowledge, training and experience, the problems identified in the Cumberland Heights treatment records reviewed on June 30 in the aggregate compelled the conclusion that Cumberland Heights was not providing the quality of care to Magellan members that is required by Magellan of its "in-network" providers and that Magellan members in treatment there were at risk of harm.

**FURTHER AFFIANT SAYETH NOT.**

_____
Gary M. Henschen, MD

SWORN TO AND SUBSCRIBED BEFORE ME
this 16th day of August, 2010.

_____
NOTARY PUBLIC

My Commission Expires on 11-7-2011

*[Notary Seal: AMY D. HAMPTON, STATE OF TENNESSEE NOTARY PUBLIC, DAVIDSON COUNTY, TENN.]*
My Commission Expires NOV. 7, 2011