Cumberland Heights Foundation, Inc. v. Magellan Behavioral Health, Inc.
United States District Court for the Middle District of Tennessee
Civil Action No. 03:10-00712

Affidavit of Gary M. Henschen, M.D.

Exhibit 3 – August 9, 2010 Letter (redacted)



# CUMBERLAND
# HEIGHTS

FOUNDED 1966

August 9, 2010

Magellan Health Services
Attn: T. Brian Kennedy, MD
Medical Director
Southeast Care Management Center
P.O. Box 1619
Alpharetta, GA 30009

Dear Dr. Kennedy,

    Thank you for your letter of August 6, 2010 discussing Magellan's June 30, 2010 site visit findings. Cumberland Heights welcomes constructive feedback from Magellan, particularly feedback which enables us to better serve people suffering from the disease of addiction. As you know, Magellan's National Provider Handbook provides that Magellan will work closely with providers in implementing corrective action plans, when required by Magellan. We hope that the following information will assist Magellan in collaborating with Cumberland Heights in that regard.

    Prior to Magellan's letter of October 16, 2009, Cumberland Heights enjoyed a positive working relationship with Magellan, and Magellan never identified any quality of care issues that Cumberland Heights did not promptly resolve to Magellan's satisfaction. We believe that many of the problems recently identified by Magellan's Southeast Care Management Center were rooted in miscommunication between Magellan and Cumberland Heights, rather than more serious quality of care issues. For example, Cumberland Heights believes that Magellan's letter of October 16, 2010 was based upon Magellan's inadvertent misunderstanding of the facts. Magellan identified what it perceived as quality of care issues in its letter dated October 16, 2009. That letter read in part: "the members of the RNCC felt the following corrective actions needed to occur." However, no corrective actions were identified in the letter. (See Exhibit A attached). Therefore, Cumberland Heights was unable to appropriately respond to Magellan or to undertake any corrective actions with regard to that communication from Magellan. After receiving Magellan's October 16 letter, Cumberland Heights promptly forwarded the requested records to Magellan. Because there was no response from Magellan following Cumberland Heights' submission of those records, we believed that any potential concerns were resolved.

    An additional example of miscommunication is demonstrated by the fact that Magellan identified several items as "missing" from patient charts that were in fact present in the patients'

REDACTED

REDACTED

medical records. As you know, during the January and June site visits, Magellan indicated a preference for reviewing paper records, and it declined offers to inspect electronic records. Magellan requested that Cumberland Heights assemble and print paper records for numerous patients on an expedited basis, which was very challenging given Cumberland Heights' electronic medical record system. Unfortunately, Cumberland Heights' electric medical record ("EMR") software, called "TIER," is not particularly conducive to printing in an organized and user friendly format. As a result of that software problem, for which Cumberland Heights accepts responsibility, Cumberland Heights did not print all patient specific information chronologically and in one place. Accordingly, Cumberland Heights undertook a comprehensive EMR software redesign in order to produce a more user friendly paper record for external users. In addition, Cumberland Heights made certain staff changes in its medical record department, and a reorganization of that department is underway. Therefore, to the extent that miscommunications occurred as a result of Cumberland Heights' difficulty in producing a user friendly paper record from its EMR system, Cumberland Heights takes responsibility for that problem and has taken action to correct it.

### Medical/Behavioral Care Coordination

In its termination letter, Magellan makes reference to "appropriate medical/behavioral coordination" and "treatment of patients' overall physical health." Cumberland Heights wishes to address those stated concerns by Magellan.

Cumberland Heights has been providing safe, quality addiction medicine treatment for its patients at residential detoxification and rehabilitation levels for more than 44 years. It has provided those services to Magellan members since 2000, and has historically been considered Magellan's "go to" provider for addiction treatment.

Within the six (6) month period of January 1, 2010 through June 2010, Cumberland Heights treated 409 BCBS/Magellan members. Of those 409 members, 286 members had a medical condition diagnosed on Axis III. Those conditions included such diagnoses as gastroesphogeal reflux disease, hypertension, ulcerative colitis, chronic obstructive pulmonary disease, HIV, hepatitis C, thyroid disorders, seizure disorders, eating disorders with gastric bypasses, and chronic pain conditions. Prior to June 30, 2010, Magellan never raised any concerns about the medical treatment or coordination of medical services for patients suffering from such co-morbid conditions.

Whenever necessary, Cumberland Heights refers patients for outside medical services during their addiction treatment. Such referrals for Magellan members from January – June 2010 included: ten (10) referrals to the emergency room, four (4) to the dentist, three (3) for electrocardiograms, twenty-one (21) for a variety of x-rays, and six (6) to specialty physicians in the fields of orthopedics, neurology, obstetrics/gynecology and pain management. In addition, specific referrals were made for 257 of the 286 BCBS/Magellan patients as part of their continuing care, post-discharge. Those referrals consisted of 204 to primary care physicians, 72 to specialty physicians, 55 to ancillary health services such as physical therapy, pain management centers, etc., and 142 referrals to psychiatrists.

We hope that this information, as well as the information below, addresses Magellan's stated concern regarding "appropriate medical/behavioral coordination." I am fully prepared to answer any questions the committee may have regarding the treatment of the specific cases noted in the review of June 30 and look forward to the opportunity to do so.

### Family Involvement

Magellan's termination letter also refers to a perceived "lack of family involvement within a timely manner." Cumberland Heights also wishes to address that concern by Magellan.

Cumberland Heights has a long tradition of providing quality family services that are both timely and clinically appropriate. In fact, Cumberland Heights was one of the first chemical dependency treatment centers to develop specialty services for family members in the 1970's.

During the six month period from January 1, 2010 through June 30, 2010, 409 Magellan/BCBS members were patients at Cumberland Heights. Of those 409 patients, 85% of families were contacted within 72 hours of the patient's admission. An additional 7% of families were contacted during day 4 and day 5 of the patient's treatment for a total of 92% of families contacted within the first five days of treatment.

In addition, 86% of the 409 Magellan/BCBS members had a family session, either face to face or via phone, within the first week of the patient's admission. By day ten, 90% of the patients participated in a family session. It is of significance to note that the majority of those patients were in the residential detoxification level of care at the time of their first family session.

Cumberland Heights provided 1,735 family sessions to BCBS/Magellan members, an average of 4.24 sessions per patient. In addition, 205 families attended the structured four day family "program" for an additional 4,920 hours of family education and multi-family group counseling. In fact, Cumberland Heights provides a wide variety of family services including, but not limited to, family orientation sessions, family education groups, individual family therapy, multi-family group therapy, a structured four day family program, and a four day family "camp" for children ages 6-13 (a combination of age appropriate education, group counseling, and individual family therapy).

Cumberland Heights invests significant resources in specialized family therapists and dedicated space for family counseling and services. These services are provided for the overall benefit of the patient and family at no cost to payors and patients. However, in response to Magellan's feedback, Cumberland Heights retained two additional family counselors in order to increase family services.

We hope that this information addresses Magellan's stated concern regarding family involvement.

### Corrective Actions taken by Cumberland Heights

Although none of the concerns identified by Magellan resulted in any harm or adverse results to patients, Cumberland Heights recognizes that Magellan identified certain areas in which improvements could be made, and Cumberland Heights has endeavored to make such

August 9, 2010
Page 4

REDACTED

improvements. For example, following the January 20, 2010 site visit exit conference, Cumberland Heights convened its Clinical Documentation Committee and began an exhaustive review of the printing problems associated with the EMR software. As a result of that committee's work, Cumberland Heights made several improvements in its medical record system designed to address Magellan's feedback regarding medical documentation. In addition, Cumberland Heights undertook sit-down, face to face, training sessions with case management and counseling staff for all clinical programs after both the January and June site visits. Those training sessions were designed to address some of the clinical documentation issues identified by Magellan. Those issues did not result in any adverse patient outcomes, but Cumberland Heights nevertheless believes that its additional training will help Cumberland Heights and Magellan work together more smoothly in the future.

Cumberland Heights also trained physician staff members regarding documentation issues. In response to feedback from Magellan about inadequate documentation by a particular part-time physician, I personally counseled that physician and re-trained him on the use of Cumberland Heights' EMR system. In addition to my personal counseling of that physician, Cumberland Heights is instituting a daily audit process in order to monitor compliance by staff physicians.

In response to feedback from Magellan regarding thyroid function tests, Cumberland Heights surveyed other providers, such as Betty Ford Center, Brighton Hospital, Caron Foundation, and others, regarding TSH screenings in depressed patients. Although that survey did not reveal a clear consensus in the field, I decided that Cumberland Heights will perform TSH screenings on all patients upon admission.

### Management of Chronic Pain and Addiction at Cumberland Heights

During the June 30, 2010 exit conference, Magellan raised questions regarding the management of addiction and chronic pain in patients implying that a lack of appropriate pain management was a factor in negative treatment outcomes. However, management of addiction and co-occurring chronic, non-malignant pain presents a significant clinical challenge to all addiction medicine specialists and to the addiction treatment industry as a whole. The clinical interface between opioid dependence and pain is extremely complex.

Opioid induced hyperalgesia is well defined across pain and addiction literature, and clinically, the diminished tolerance for pain following chronic opioid use and dependence is evident. Likewise, hyperalgesia has long been recognized as a fundamental symptom of the opioid withdrawal syndrome. Thus, management of pain in the detoxification phase of treatment is particularly difficult.

Each patient admitted to Cumberland Heights undergoes a comprehensive history and physical exam. Pain is assessed at admission and each time vital signs are taken. Detoxification from opioids is typically accomplished with tapering doses of buprenorphine. Non-opioid analgesic use is encouraged as are non-medication modalities of pain control. In a psycho-educational group, the risk of medications with addiction forming liability is presented. Safe medication alternatives are discussed, and non-medication modalities of pain management are presented. Education regarding opioid induced hyperalesia is provided with the caveat that non-

opioid methods of pain control, which have not previously been effective, may become more effective with ongoing abstinence from opioids. An individualized approach to pain management is implemented for each patient.

The effectiveness of this approach is demonstrated in the treatment of our patients, including Magellan members. During the six month time period from January 1, 2010 through June 30, 2010, 47 patients who were Magellan members had an Axis III diagnosis of pain. 37 of those patients or 81% required medication, either over the counter or prescription. Of those who required medication, 32 or 86% reported that their pain had resolved, was managed by medication, or had lessened.

Five patients (13.5%) reported that their pain had not improved or that improvement was not maintained. Of those five patients, three were referred respectively to an orthopedist, an obstetrician/gynecologist, and a holistic pain management clinic. One was continuing to manage her pain with medication and planned to follow up with her primary care physician after discharge. One patient left against medical advice prior to resolving pain origin.

Although not the most popular approach currently in our society, Cumberland Heights promotes and fervently believes that abstinence from opioid medications is the foundation for recovery from opioid dependence. Recovery rates demonstrated by physician health programs prove the effectiveness of this approach to sustained recovery. However, as with all addiction treatment at Cumberland Heights, treatment is customized for patients according to their individual needs.

### Response to Specific Patient Concerns

With regard to the patient specific concerns raised by Magellan, I welcome the opportunity to answer specific questions during the committee appeal hearing. In addition, I provide the following information.

1. ⸺ This patient consistently complained of anxiety and pain throughout her stay. She was seen daily by a physician and had a psychiatric evaluation. She had multiple interventions for her anxiety, and she was on buprenorphine throughout her stay. She left against medical advice ("AMA") on day six of her detox process. The patient told a staff member, attempting to intervene regarding her decision to leave treatment, that the doctor said, "go home and call your dealer." The clinical note only documents what the patient reported, and we do not believe there is any veracity to her statement.

2. ⸺ This patient had previously been a patient at Cumberland Heights. On ⸺, she underwent a full psychiatric evaluation by Dr. ⸺. On discharge from that admission, she was referred back to her psychiatrist. She was stable on her antidepressant regimen upon readmission in ⸺. She was continued on that regimen, monitored regularly without affective instability, and referred back to her private psychiatrist at discharge.

3. ⸺ With regard to this patient, a nurse practitioner documented no known drug allergies ("NKDA"). Cumberland Heights acknowledges that such documentation was a mistake given that the patient reported "dizziness" associated with Penicillin. Although the

patient's report of "dizziness" associated with Penicillin is not a typical symptom of an allergic reaction, the patient's report of allergy is documented clearly in the Physician's Orders and the Medication Administration Record. In addition, no adverse outcome or harm resulted from this documentation error.

Magellan's comment regarding a psychiatric evaluation being ordered on is inaccurate. Actually, the attending physician did not order a psychiatric evaluation until

With regard to family involvement, the patient was admitted to Cumberland Heights on He did not sign releases of information for family until At that time, the counselor called and collected extensive collateral information from the patient's who stated that he and the patient's were supportive of the patient's recovery. The counselor held a phone session with the patient and his the next day (the first day after the patient signed a release). Cumberland Heights held a face-to-face session with the patient and his and on Additional face-to-face sessions were held on and The patient was discharged on

4. - This patient had multiple medical problems and was referred to Centennial Medical Center on following a syncopal episode. Dr. Henschen indicated that the patient had been treated for a small bowel obstruction at Medical Center. Although small bowel obstruction was in the differential diagnosis on the ED report, the History and Physical at , performed by Dr. , dismissed the diagnosis of small bowel obstruction. In fact, Dr. made the statement that there were "no abdominal problems." Dr. further stated that the patient's episode of syncope was due to dehydration.

With regard to consideration of the patient's treatment with Nortriptyline, that medication was noted on his admission medications at , and he was discharged back to Cumberland Heights on Nortriptyline. Dr. was well aware of the patient's Nortriptyline, and, in fact, ordered a level which was in the therapeutic range. Dr. notes clearly show recognition of the marked potential for drug interactions with Nortriptyline, and he obtained a level for that reason. Further, Dr. considered the issue of pharmacogenomic variation, as there are approximately fifty (50) known variants of 2d6 that may affect the metabolism of Nortriptyline. Dr. Henschen stated that there is a significant drug interaction with Nortriptyline and Coumadin, which the patient was also taking, though no significant interaction is known. Please refer to documentation that Cumberland Heights previously provided, referencing the accurate diagnoses related to his syncopal episode, as well as the management of his Nortriptyline.

With regard to family involvement, Cumberland Heights first made contact with the patient's family on day 3 of admission. The patient was hospitalized and re-admitted to Cumberland Heights on A telephone session with the patient's was held on (two days following re-admission from Medical Center). On the patient's counselor invited the patient's to attend the structured family program. The counselor had a lengthy phone session with the patient's at that time, and she attended the structured family program on

5.           . — This patient was admitted and then authorized for a detoxification level of care. His history indicated a level of opioid use that would be expected to produce a clinically significant withdrawal syndrome. His Clinical Opiate Withdrawal Scale ("COWS") score on admission was twelve (12). He never demonstrated a progression of withdrawal symptoms and his COWS decreased. No detox medications were ordered because no detox medications were clinically indicated. However, the patient was medically monitored by the attending physician on a daily basis and by licensed nursing staff on a 24/7 basis throughout the detoxification phase of his treatment.

6.           . - With regard to a lack of neurological evaluation, Cumberland Heights staff clearly documented, in the body of the admission physical exam, the patient was alert and oriented, pupils were slightly dilated, she ambulated without difficulty, she exhibited a slight tremor, and her deep tendon reflexes were 1+ and symmetrical. She was detoxed using tapering doses of buprenorphine. During the course of daily detox visits, the patient's pain was assessed. A treatment plan was developed, and the patient was treated with non-opioid pharmacotherapy. Dr. Henschen criticized the care of the patient because she had not been referred for consultation with a pain specialist. Her history indicated that she had seen a variety of medical specialists over the years for her back pain, and had always been treated with opioid medications. The patient had never before been engaged in specialty care for her addiction. Dr. Henschen also stated that the patient should have been referred to a pain management specialist and a neurologist, based on her history and physical. In my experience, it is not reasonable to expect this level of access to specialty services in a non-emergency situation, from a residential treatment center, nor is it available in the Nashville area. A continuing care treatment plan was being developed, and had the patient remained in treatment, her referrals for specialty services as part of her continuing care plan would have been finalized.

With regard to family involvement, Cumberland Heights first made contact with the patient's          at the time of her admission on              He was later invited to family education group on              . The patient's          attended the family education group with the patient's      on          .; three days after the patient finished her detoxification protocol. Please see documentation previously provided regarding family sessions with this patient.

7.           — The patient was admitted to Cumberland Heights on              The counselor who performed the biopsychosocial assessment on the patient indicated that he would be referred for psychiatric evaluation. The patient was monitored daily by the attending physician through the detoxification phase of treatment, and regularly afterwards. No other Axis I diagnosis, besides Alcohol Dependence, was noted. No significant affective symptoms were noted, and no psychiatric evaluation was warranted.

With regard to family involvement, Cumberland Heights contacted the patient's          on          ', the day following his admission. The counselor updated the patient's          on the patient's status and oriented her to the program at that time. A Cumberland Heights family counselor contacted the patient's          again on              to give her further information on the structured family program, which she decided to attend. On              the patient's counselor documented a decision had been made to have a telephone family session with the          alone, based on the patient's current status in treatment. The patient's          attended the

structured family program on            Upon completion of the family program, Cumberland Heights conducted additional family sessions on       and       . The patient's       continued to attend outpatient family education sessions upon the patient's transition to the outpatient program.

8.       – This patient was admitted to Cumberland Heights for the second time on        On       , Cumberland Heights completed a biopsychosocial assessment of the patient. On       , Cumberland Heights transferred the patient to intensive outpatient treatment. The patient experienced difficulty maintaining abstinence and was referred back to Cumberland Heights for residential detox on       Because that additional admission to residential treatment was part of one continuous course of treatment by Cumberland Heights, an additional biopsychosocial assessment was not indicated.

## Conclusion

Cumberland Heights has treated more than 80,000 chemically addicted patients since beginning operations in 1966. Cumberland Heights is consistently named one of the leading addiction treatment centers in the nation, and we regularly receive referrals from all 50 states and more than 15 foreign countries. We have maintained more than 55 contracts, in good standing, with third party payors for many years. It is with that background in mind that Cumberland Heights believes that it can continue to serve as a valuable member of Magellan's behavioral health network.

I sincerely hope that the information above adequately addresses the concerns raised by Magellan in its January and June site visits. Cumberland Heights believes that, although several of the issues identified by Magellan can lead to improved care and communications between our institutions, none of those issues amount to poor quality care and none resulted in any adverse patient outcomes. Cumberland Heights believes that it has complied fully with Magellan's policies and procedures, and the terms of its contract with Magellan, and it has been happy to make additional improvements in hopes of enhancing its relationship with Magellan.

Very truly yours,

C. Chapman Sledge, MD, FASAM

Enclosure

cc: Tony Kotin, MD
Mary C. Shorter-Fahimi
Magellan National Network Credentialing Committee
George Nolan
Robert S. Patterson
Patricia Moskal
Cumberland Heights Executive Committee
James B. Moore
Cinde Stewart-Freeman