IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CUMBERLAND HEIGHTS FOUNDATION, INC., | ) ) ) | |
| Plaintiff, | ) ) | No. 3:10-cv-00712 Judge Nixon |
| v. | ) ) | |
| MAGELLAN BEHAVIORAL HEALTH, INC., | ) ) | |
| Defendant. | ) | |

## ORDER

Pending before the Court is Plaintiff Cumberland Heights's ("Cumberland Heights" or "Plaintiff") Motion for Preliminary Injunction ("Plaintiff's Motion") (Doc. No. 19) and Memorandum in Support (Doc. No. 20). Defendant Magellan Behavioral Health, Inc. ("Magellan" or "Defendant") filed a Response in Opposition (Doc. No. 30). Plaintiff filed a Motion for Leave to file a reply (Doc. No. 34). The Court held a preliminary injunction hearing on August 23, 2010.

Plaintiff's Motion for Leave is hereby **GRANTED**. For the reasons set forth below, Plaintiff's Motion for Preliminary Injunction is **DENIED**.

Defendant also filed two motions to strike ("Defendant's Motions") (Doc. Nos. 32, 41). Defendant's Motions are hereby **DENIED as moot**.

## I. BACKGROUND

### A. Factual Background[1]

This is a contract dispute case, where the Plaintiff Cumberland Heights claims Defendant Magellan Behavioral Health, Inc., wrongfully terminated a contract between the two parties.

Plaintiff Cumberland Heights is a non-profit alcohol and drug addiction treatment center that treats individuals suffering as a result of alcohol and drug addiction. Defendant Magellan Behavioral Health, Inc. is a large managed care company that contracts with health insurers and employers to manage the addiction treatment and behavior health benefits provided by insurers and employers to their policy holders and employees. Through its relationship with Blue Cross Blue Shield (BCBS), Magellan controls about 45 percent of Cumberland Heights's annual revenues. On August 11, 2000, Parties entered into a written Facility and Program Participation Agreement ("Agreement").

Twice, in February and December 2009, Cumberland Heights appealed decisions by Magellan denying benefits for treatment to two of its members at Cumberland Heights. This decision was eventually appealed to BCBS, who reversed Magellan's decision both times.

Beginning in October 2009, Magellan initiated an inquiry and review process of Cumberland Heights's performance focused on Cumberland Heights's treatment records and quality of care of Magellan members. As an eight month review process progressed, Magellan requested a sample of patient treatment records for review, undertook a site review of additional treatment records, initiated a written corrective action plan, and conducted a follow-up site visit. On March 17, Magellan sent Cumberland Heights a letter noting its concerns with Cumberland

---

[1] The facts in this section are taken from Plaintiff's Memorandum in Support (Doc. No. 20) and Defendant's Response in Opposition (Doc. No. 30), unless otherwise noted.

Heights's procedures, a letter Magellan refers to as the "Corrective Action Plan."  (Affidavit of T. Brian Kennedy, M.D., Doc. No. 26, at 14-15.)

On July 1, Magellan informed Cumberland Heights by telephone that it was immediately terminating the Agreement.  Later that day, Magellan sent a letter by fax to Cumberland Heights, reiterating that it was immediately terminating the Agreement.  The relevant part reads: "The termination is due to your facility's inability to provide services to members that meet Magellan's Medical Necessity Criteria, in particular failing to meet Magellan standards by providing the appropriate medical/behavioural coordination, treatment of the patients overall physical health and lack of family involvement within a timely manner."  (Termination Letter, Doc. No. 26-6, at 2.)  The termination had the effect of excluding Cumberland Heights from its network of approved behavioral health providers; however, Plaintiff remains free to admit and treat Magellan members on an "out-of-network" basis.

### B. Procedural Background

On July 21, 2010, Plaintiff Cumberland Heights filed a Complaint in the Chancery Court for Davidson County, TN, claiming wrongful termination of the Agreement. (Doc. No. 1, Ex. A.)

On July 27, Defendant Magellan removed this case to federal district court.  (Doc. No. 1.)

On August 9, Parties filed an Agreed Order for Hearing on Preliminary Injunction, and on August 17, Plaintiff filed this Motion for Preliminary Injunction (Doc. No. 19).  On August 23, this Court held a preliminary injunction hearing.

## II. LEGAL STANDARD

In determining whether to grant injunctive relief, the court must consider four (4) factors: (1) whether movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of a preliminary injunction. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (quoting *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005)). These considerations are "factors to be balanced, not prerequisites that must be met." *Certified Restoration*, 511 F.3d at 542 (quoting *Jones v. City of Monroe, Mich.*, 341 F.3d 474, 476 (6th Cir. 2003)). "A district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue." *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1381 (6th Cir. 1995) (citing *International Longshoremen's Ass'n, AFL-CIO, Local Union No. 1937 v. Norfolk S. Corp.*, 927 F.2d 900, 903 (6th Cir.)).

A preliminary injunction is an extraordinary remedy which should only be granted if the movant carries his or her burden of persuasion. *Avery Dennison Corp. v. Kitsonas*, 118 F.Supp.2d 848, 851 (S.D. Ohio 2000) (citing *Stenberg v Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978)). Moreover, "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," given the extraordinary nature of the remedy and the exercise of power required from the court. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citing *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir. 1991).

### III. LEGAL ANALYSIS

#### A. Likelihood of Success on the Merits

Cumberland Heights's rights and remedies in this case are controlled by the terms of the Agreement. Under the Agreement, Magellan may terminate the Agreement immediately by giving written notice to Cumberland Heights upon the occurrence of several events, listed in § 11.3 of the Agreement. Importantly, included in these listed events are:

> (i) [Cumberland Heights]'s breach of any of the terms or obligations of this Agreement;
> (j) Any occurrence of serious misconduct which brings Magellan to the reasonable interpretation that [Cumberland Heights] may be delivering clinically inappropriate care; or
> (k) [Cumberland Heights]'s breach of Magellan Policies and Procedures.

(Agreement, Doc. No. 30-1, § 11.3.) Furthermore, either party may terminate the Agreement without cause upon ninety (90) days prior written notice of termination to the under party. (*Id.* at § 11.2.)

Also under the Agreement, any communication to Cumberland Heights must "be in writing and shall be deemed given only if delivered personally or sent by registered, certified or regular mail or by express mail courier service." (*Id.* at § 12.9.)

Cumberland Heights alleges that Magellan wrongfully terminated its Agreement in several respects: (1) Magellan provided Cumberland Heights with improper notice of termination in its Termination Letter, since Magellan failed to deliver the notice of termination by the agreed and proscribed method set forth in § 12.9 of the Agreement; and (2) Magellan's cause for termination was not one permitted by § 11.3 of the Agreement, and even if it was, Magellan's stated cause for termination was merely pretext for termination as retaliation for Cumberland Heights's participation in Magellan's appeal process. (Doc. No. 20, at 11.) Since retaliation is an impermissible cause for termination under the Agreement, Cumberland Heights asserts that Magellan breached the Agreement. (*Id.*)

-5-

### *a)* *Proper Notice of Termination*

Cumberland Heights states that Magellan provided Cumberland Heights with improper notice of termination in its Termination Letter, since Magellan failed to deliver the notice of termination by the agreed and proscribed method set forth in § 12.9 of the Agreement. While Magellan concedes that even though its form of notice via telephone and fax was not technically compliant with the notice requirements, such technical deficiency does not void the termination, particularly where Cumberland Heights acknowledges that it received actual notice of the termination on July 1, 2010, first by the phone call, and promptly followed with a written notice letter delivered by facsimile. (Doc. No. 30, at 25 n.12.) Magellan cites, *inter alia*, *Barnes v. Bradley County Mem. Hosp.*, 161 Fed. App'x 555 (6th. Cir. 2006), in support of the proposition that actual notice is sufficient to establish that a party terminated a contract when the method of giving written notice is not followed.

In *Barnes*, the plaintiff contended that the defendant's verbal notice of termination essentially satisfied the notice requirement in his employment contract, despite the contract's clear language that stated that notice must be given in writing. The court stated, "Tennessee courts have refused to enforce a technical written notice requirement when it is obvious that there was actual notice, and a lack of written notice did not prejudice a party's rights." *Barnes*, 161 Fed. App'x at 559. However, the court in *Barnes* found that this rule was inapplicable in its case, because the plaintiff failed to establish that any actual notice, verbal or written, had been given.

The Court finds the rule articulated but not applied in *Barnes* applicable here. Here, unlike in *Barnes*, Cumberland Heights concedes that it did receive notice of termination. Furthermore, Cumberland Heights does not state that it was prejudiced by receiving notice by

faxed letter instead of mailed letter. For these reasons, Magellan's delivery of notice by facsimile rather than by mail is immaterial. The Court finds that Cumberland Heights does not have a strong likelihood of success on the merits on this claim for relief.

*b)     Proper Cause*

Cumberland Heights alleges that Magellan's cause for termination was not one permitted by § 11.3 of the Agreement, and even if it was permitted, was mere pretext for retaliation.

(1)     Magellan's Stated Cause for Termination

Magellan states that it properly terminated the Agreement with cause, pursuant to § 11.3 of the Agreement. (Doc. No. 30, at 1.) Section 11.3 of the Agreement permits termination when Cumberland Heights breaches of any of the terms of the Agreement or any of Magellan's Policies and Procedures. (Agreement, § 11.3.) Section 2.1 of the Agreement requires Cumberland Heights to offer "quality health care" and to "document[] the medical care in conformance with . . . Magellan's accreditation guidelines." (*Id.* at § 2.1.)

When read to the exclusion of other documents, Magellan's causes for termination in the Termination Letter appear vaguely-worded. In the Termination Letter, Magellan cites to Cumberland Heights failure to "provid[e] the appropriate medical/behavioural coordination, treatment of the patients overall physical health and lack of family involvement within a timely manner." (Termination Letter, Doc. No. 26-6, at 2.) Such causes may be deemed ambiguous when read out of context.

The stated causes for termination lose their ambiguity, however, when read in the context of a March 17, 2010 letter from Magellan to Cumberland Heights, listing a number of "Areas of concern" ("March 17 Letter"). (Doc. No. 26, Ex. 3.) The March 17 Letter summarized the findings of a January 2010 site review of Cumberland Heights conducted by Magellan. A core

-7-

theme running through this list of concerns was Cumberland Heights's inadequate recordkeeping of patients' personal and clinical information, including the absence of biosocial history for each patient, inadequate or inaccurate clinical observations, inadequate or inaccurate records of clinical activities, etc. The March 17 Letter also expresses concern that "Family sessions do not appear to be done on every patient and no note of explanation in the chart as to why." (*Id.* at 2.) The letter ends with a list of specific corrections Cumberland Heights is expected to take to remedy the stated concerns. When read in the context of this letter, the language in the Termination Letter becomes clear— the failure to "provid[e] the appropriate medical/behavioural coordination" indicates that Cumberland failed to provide accurate and sufficient medical records. Failure to provide "treatment of the patients overall physical health" points to Magellan's concerns that not enough clinical sessions with patients were being performed. "[L]ack of family involvement within a timely manner" reflects Magellan's concern that family sessions did not appear to be done on every patient.

Magellan's stated causes for termination (i.e., that Cumberland Heights failed to provide appropriate medical/behavioural coordination, failure to provide treatment, and lack of family involvement), when read in the context of the March 17 Letter, qualify as permissible causes for termination under § 11.3 of the Agreement. Plaintiff has not shown that there is a strong likelihood that the plain language of Magellan's Termination Letter cited an improper cause for termination.

(2) <u>Whether Magellan's Stated Cause Was Pretext</u>

Cumberland Heights asserts that Magellan's stated causes for termination in the Termination Letter, even if permissible on its face, were mere pretext for retaliation.

Specifically, Cumberland Heights alleges that Magellan terminated the Agreement in retaliation for Cumberland Heights's participation in several patient appeals for coverage.

The Court found certain considerations that indicate that Magellan's causes for termination were not pretext for retaliation.

First, Cumberland Heights has been unable to show that Magellan had motivation to retaliate against Cumberland Heights for its participation in the appeals process. During the Hearing, the Court asked Cumberland Heights's counsel how the adverse appeals rulings hurt Magellan. Counsel responded that the doctor responsible for denying benefits was humiliated after his decision was reversed. However, Magellan responded that, not only was the doctor not embarrassed, but during the October 6, 2009 appeal hearing, in light of previously undisclosed facts, Magellan doctors reversed their own conclusion and agreed that additional benefits should be provided to the appealing member. (Doc. No. 26, at 9.) The Court finds Cumberland Heights's reasoning unconvincing, and not likely proof of pretext.

Second, Cumberland Heights fails to explain why, if Magellan had wanted to terminate the Agreement with Magellan in retaliation for the appeal hearings, Magellan did not just give Cumberland Heights 90 days notice of termination without cause. Instead, Magellan chose to undergo an extensive review process involving two site visits, a corrective action plan, and an opportunity to fix the noted delinquencies. Cumberland Heights provides no explanation for why Magellan opted for the more difficult route in light of the less onerous § 11.2 term without cause provision.

Because the Magellan cited proper cause for termination of the Agreement, and because Cumberland Heights was unable to show a high likelihood that the stated cause was pretext, the

Court finds that Plaintiff failed to produce evidence illustrating a high likelihood of success on the merits.

### B. Irreparable Harm

In order to obtain a preliminary injunction, the movant must demonstrate that failure to receive an injunction is likely to result in irreparable harm. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1068 (6th Cir. 1998). The Sixth Circuit states that a plaintiff's harm "is irreparable if it is not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002).

Cumberland Heights states that two parties will be harmed absent a preliminary injunction. First, Cumberland Heights states that patients and their families will be harmed by being denied access to Cumberland Heights. Second, Cumberland Heights states that absent a preliminary injunction, Cumberland Heights will suffer grave financial injury, and be forced into insolvency and/or to lay off many employees.

#### 1. *Harm to Patients*

Cumberland Heights states that the termination, if allowed to stand, "will deprive hundreds of vulnerable patients and families from receiving desperately needed treatment for alcohol and drug addiction treatment from one of the premier treatment facilities in the nation." (Doc. No. 20, at 18.) Magellan responds that patients and their families are not harmed. First, it states, Magellan has 13 other providers in Tennessee that can provide service to its members. (Doc. No. 30, at 32.) Second, Magellan notes that Cumberland Heights is still an "out-of-network" provider, whereby Magellan members may still admit themselves as patients. (Doc. No. 30, at 31.) In support of this argument, Magellan states that 31 of the 33 Magellan members who were admitted at Cumberland Heights at the time of termination completed their treatment

there.  Furthermore, Magellan observes, Cumberland Heights has admitted and treated approximately 43 new Magellan members during the first month after termination.  (*Id.*)  The Court finds Magellan's argument more convincing—patients are unlikely to suffer irreparable harm absent an injunction, as they are still permitted to seek treatment at Cumberland Heights.  Furthermore, there are many other in-network providers available in Tennessee where Magellan members can seek treatment.

### 2. *Harm to Cumberland Heights*

Cumberland Heights states that absent a preliminary injunction, the facility will suffer grave financial injury, and be forced into insolvency and/or to lay off many employees.  Magellan asserts that Cumberland Heights's financial injuries are not irreparable because they can be redressed through monetary remedies.

Magellan cites *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992), in support of the proposition that a plaintiff's harm is not irreparable if it is fully compensable by money damages.  While this is the general rule, there is an exception when the harm that is threatened is the loss of a movant's enterprise; such injury has been deemed irreparable.  *Performance Unlimited v. Questar Publishers*, 52 F.3d 1373, 1382 (6th Cir. 1995); *Frontier Health, Inc. v. Shalala*, 113 F. Supp. 2d 1192 (E.D. Tenn. 2000).  The reasoning behind the exception is that if a plaintiff's business becomes insolvent and ceases to exist, money damages cannot compensate the plaintiff and there is no adequate remedy at law.  *N. Warehousing v. State*, 2006 Mich. App. LEXIS 593 (Mich. Ct. App. Mar. 7, 2006).  In both *Performance Unlimited* and *Frontier Health*, the Court found irreparable injury where 60 percent or more of the plaintiffs' gross revenues relied on the defendants' businesses.  *Performance Unlimited*, 52 F.3d at 1381; *Frontier Health, Inc.*, 113 F. Supp. 2d at 1193.

Here, Cumberland Heights has stated that Magellan controls approximately 45 percent of Cumberland Heights's annual revenues, totaling approximately $9.7 million. (Doc. No. 20, at 2.) Cumberland Heights asserts in its Motion that loss of in-network status with Magellan will force the facility into insolvency. Cumberland Heights states that absent any injury, Cumberland Heights's cash reserves will be exhausted by 2010, and its line of credit will be exhausted by February 2011. (Doc. No. 20, at 17.) Magellan counters by stating that Cumberland Heights's claims of insolvency are exaggerated, that Cumberland Heights has a current assets balance of $5 million, and that Cumberland Heights's out-of-network status would not lead to the full loss of 45 percent of its revenue, since Magellan members continue to seek services from Cumberland Heights, and Magellan continues to pay Cumberland Heights as an out-of-network provider. In the thirty days following termination, approximately 43 Magellan members have received covered inpatient services at Cumberland Heights (Doc. No. 27, at 13), in contrast with the approximately 65 Magellan members treated per month when Cumberland Heights maintained in-network status. (Doc. No. 30, at 33.)

This Court finds that the irreparable harm factor falls in favor of Cumberland Heights. Even if Cumberland Heights loses less than 45 percent of its annual revenue, this is a significant loss for any company, one that the Court believes would launch a company into insolvency.

### C. Substantial Harm to Others

The third factor to consider is "whether the issuance of the injunction would cause substantial harm to others." *Tumblebus*, 399 F.3d at 760.

Cumberland Heights states that "Magellan is contractually obligated to provide mental and behavioral health benefits to its members . . . . By restoring Cumberland Heights to Magellan's network of approved providers, Magellan will be able to provide better and more

-12-
Case 3:10-cv-00712   Document 47   Filed 09/07/10   Page 12 of 15 PageID #: 852

complete benefits to its members, without any harm to Magellan and to the great benefit of those members." (Doc. No. 20, at 18.) Magellan states that the balance of harms weights heavily in favor of Magellan, since if the injunction is granted, the Court will force Magellan to contract with Cumberland Heights against its will, and to mandate Cumberland Heights's reinstatement as an in-network provider would subject Magellan to potential third party claims for offering Cumberland Heights as an "in-network" facility. (Doc. No. 30, at 36.)

Magellan is clearly harmed in being forced to contract with Cumberland Heights against its will. Magellan's claim regarding potential litigation resulting from the preliminary injunction is meritless, however, as Magellan would always have the affirmative defense of abiding by a court order. Regardless, a party's freedom to contract and act in accordance with the terms of such contract, by itself, is extremely important, and finds Magellan would be harmed by being forced to engage in activity that would force it to do otherwise.

### D.     Impact on Public Interest

The final factor to consider is the "public interest." In support of its argument, Cumberland Heights restates the potential harm to current and potential patients of Cumberland Heights. Cumberland Heights also restates the potential harm it may suffer.

Magellan also highlights the interest of the patients, and states that the safety of patients would be best served if Magellan were permitted to choose to contract with health care treatment facilities that met its standards for safety. Magellan also reiterates that Cumberland Heights is not in danger of going out of business, and that because the parties have contracted to resolve any disputes through arbitration, the public interest is not served by granting injunctive relief.

As explained *supra*, the patients are not greatly harmed absent an injunction. Furthermore, while Cumberland Heights may suffer irreparable injury, there is no public interest

in ensuring that the organization remain solvent. Finally, courts have widely found that courts have authority to grant injunctive relief in the presence of a mandatory arbitration clause. *See Performance Unlimited, Inc.*, 52 F.3d 1373, 1380-82 (6th Cir. 1995). Magellan does not state anything to the contrary. Public interest is therefore best served in compliance with this general rule.

"In actuality, the question of whether the 'public interest' will be served by one result or the other hinges on the merits of the case. If defendant is [behaving] lawfully, the public interest supports the denial of an injunction." *Waldmann Lighting Co. v. Halogen Lighting Sys., Inc.*, 28 U.S.P.Q.2d 1682, 1686 (N.D.Ill. 1993). Public interest therefore falls in favour of Magellan. Because Cumberland Heights was unable to show a likelihood of success on the merits, the public interest does not favor injunctive relief. *See Waldmann Lighting Co. v. Halogen Lighting Sys., Inc.*, 28 U.S.P.Q.2d 1682, 1686 (N.D.Ill. 1993) ("[i]f defendant is competing lawfully, the public interest supports the denial of an injunction").

## IV. CONCLUSION

The Court finds that the likelihood of success, the substantial harm to others, as well as the impact on the public interest all fall in Defendants' favor. Although there is evidence before the Court that Plaintiff will suffer harm as a result of Defendants' conduct, the Court cannot grant a preliminary injunction as a result of lawful conduct. *United Transp. Union v. Michigan Bar*, 401 U.S. 576, 584 (1971) ("an injunction can issue only after the plaintiff has established that the conduct sought to be enjoined is illegal"). As a result, Plaintiff's Motion is **DENIED**.

It is so ORDERED.

Entered this the ___7th_____ day of September, 2010.


JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT